UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ELIZABETH E. FRASIER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 1:23-cv-00133-SLC |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Martin O'Malley,* | ) |
| *Commissioner of Social Security* | ) |
| *Administration*,[1] | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Elizabeth E. Frasier appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1). Because at least one of Frasier's three arguments on appeal is persuasive, the Commissioner's decision will be REVERSED and the case REMANDED for further proceedings.

**I. FACTUAL AND PROCEDURAL HISTORY**

Frasier applied for DIB in May 2021, alleging disability as of November 23, 1981. (ECF 12 Administrative Record ("AR") at 20, 171-72).[2] Frasier's claim was denied initially and upon reconsideration. (AR 75-91). On July 15, 2022, administrative law judge ("ALJ") Kathleen Winters conducted an administrative hearing, at which Frasier, who was represented by counsel,

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023, and thus, pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted for Kilolo Kijakazi in this case. *See Melissa R. v. O'Malley,* No. 1:22-cv-02404-TAB-TWP, 2023 WL 8866397, at *1 n.1 (S.D. Ind. Dec. 22, 2023).

[2] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

and a vocational expert ("VE") testified. (AR 40-74). On September 16, 2022, the ALJ rendered an unfavorable decision to Frasier, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (AR 20-34). The Appeals Council denied Frasier's request for review (AR 5-10), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Frasier filed a complaint with this Court on March 27, 2023, seeking relief from the Commissioner's decision. (ECF 1). Frasier argues in this appeal that the ALJ erred by: (1) failing to build a logical bridge from the evidence to her conclusion; (2) relying on the opinions of the state agency physicians and playing doctor when considering the evidence; and (3) relying on the VE's testimony which lacked reliable methodology as to the number of jobs. (ECF 17 at 6).[3]

On the date of the ALJ's decision, Frasier was forty years old (AR 171); had a tenth grade education (AR 195); and had past relevant work as a packer, management trainee, manager, and sales clerk (AR 32, 65-66). Frasier alleges disability based on the following conditions: Legg-Perthes disease;[4] severe osteoarthritis of the hip; severe chronic deformity of the femoral head; carpal tunnel syndrome; attention deficit/hyperactivity disorder (ADHD), combined presentation; depressive disorder; generalized anxiety disorder; asthma; congestive heart failure; and dysuria. (ECF 17 at 5).

---

[3] Frasier frames these arguments with respect to the physical limitations assigned in the ALJ's residual functional capacity ("RFC") assessment. (*See id.* at 8-16). Given that Frasier does not challenge the mental RFC assigned by the ALJ, the Court will focus herein on Frasier's physical impairments.

[4] Perthes Disease, or Legg-Calve-Perthes Disease, "is a rare childhood condition affecting the hip joint. Bone in the 'ball' (femur head) part of the 'ball and socket' hip joint dies from lack of blood supply. When the blood supply returns, a new femoral head forms." Perthes Disease, https://my.clevelandclinic.org/health/diseases/14587-perthes-disease (last visited Mar. 8, 2024). "Treatments include time/observation, drugs, physical therapy, casting and surgery. Most children return to normal activities without limitations." *Id.*

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less

3

than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520.[5] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The Commissioner's Final Decision

The ALJ noted at the outset that Frasier was insured for DIB through June 30, 2025. (AR 22). At step one of the five-step analysis, the ALJ found that Frasier had engaged in substantial gainful activity ("SGA") during the following periods: 1999 to 2001, 2007 to 2010, 2015 to

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can do despite her limitations. 20 C.F.R §§ 404.1520(a)(4), 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id.* § 404.1520(e).

4

2017, and 2019 to the third quarter of 2020. (*Id.*). However, the ALJ found that there had been a continuous twelve-month period during which Frasier did not engage in SGA. (AR 23). The ALJ then stated that her remaining findings addressed the period in which Frasier did not engage in SGA and continued on with the five-step sequential analysis. (*Id.*).

At step two, the ALJ found that Frasier had the following severe impairments: deformity of the left hip with dysplasia and osteoarthritis of the bilateral hips; Perthes disease; obesity; ADHD; depressive disorder; and general anxiety disorder. (*Id.*). At step three, the ALJ concluded that Frasier did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 24). The ALJ then assigned Frasier the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl; and can never climb ladders, ropes, or scaffolds, or balance, as that term is used vocationally. Work with an option to change positions no more frequently than ever[y] 30 minutes, while remaining on task. With occasional exposure to extreme cold, extreme heat, humidity, fumes, dusts, odors, gases, and poor ventilation. With work that can be learned in 30 days or less, with simple routine tasks, simple work-related decisions, and routine workplace changes. She can remain on task, persist, and maintain pace in two-hour increments. With occasional interaction with coworkers, supervisors, and the general public.

(AR 27).

The ALJ determined at step four that given the foregoing RFC, Frasier could not perform any of her past relevant work. (AR 32). At step five, the ALJ found that Frasier could perform a significant number of unskilled, light-exertional jobs in the economy, including general office helper (10,500 positions nationally) and routing clerk (30,000 positions nationally). (AR 32-33). Therefore, Frasier's application for DIB was denied. (AR 34).

*C. Reliability of the VE's Methodology as to the Number of Jobs*

The Court will begin with Frasier's third argument, in which she asserts that the ALJ's step-five finding is not supported by substantial evidence because the VE's testimony about the number of jobs lacks reliable methodology. (ECF 17 at 17-19). Specifically, Frasier faults the VE for relying, at least in part, on the questionable "equal distribution" methodology to arrive at her job number estimates, and the ALJ for failing to question the VE about her methodology after Frasier's attorney objected to it. (*Id.*). For the following reasons, the ALJ's step-five finding necessitates that the case be remanded.

1. <u>Applicable Law</u>

At step five, the Commissioner bears the burden of "providing evidence that demonstrates that . . . work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). "Because estimating job numbers is no easy feat, ALJs commonly rely on the testimony of vocational experts—professionals with experience in job placement and knowledge of working conditions." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); 20 C.F.R. § 416.966(e)).

"In the context of job-number estimates, substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology." *Id.* at 763 (citation omitted); *see also Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020); *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018); *Ehrhart v. Sec'y of Health & Hum. Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'" *Ruenger*, 23 F.4th at 763 (quoting *Biestek*, 139 S. Ct. at 1155). "And when . . . the claimant challenges the job-number

estimate, the ALJ must compel the vocational expert to offer a 'reasoned and principled explanation' of the methodology she used to produce the estimate." *Id.* (quoting *Chavez*, 895 F.3d at 970). "The expert's explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Id.* (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

Having said that, "[e]stablishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Chavez*, 895 F.3d at 968. "A VE's estimate will be just that—an estimate." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla." *Biestek*, 139 S. Ct. at 1154 (citations and internal quotation marks omitted).

When estimating the number of jobs available in response to hypotheticals posed by the ALJ, a VE will often use one of two methods:

> (i) the equal distribution method, which involves finding the total number of jobs in an occupational group and dividing that number by the number of occupations in the group; and (ii) the occupational density method, which considers the intersection of the broad category of available jobs and the particular industry in which the claimant would work.

*Dawn L. C. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00626-GCS, 2021 WL 4488421, at *6 (S.D. Ill. Sept. 24, 2021) (internal citations omitted); *see also Albright v. Kijakazi*, No. 1:20-CV-438-JPK, 2022 WL 669897, at *5 (N.D. Ind. Mar. 4, 2022). The Seventh Circuit Court of Appeals has "repeatedly questioned the accuracy of the equal distribution method." *Ruenger*, 23 F.4th at 762 (citing *Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015); *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)); *see also Albright*, 2022

WL 669897, at *5.[6] Yet, the Seventh Circuit has also "consistently declined to reject any particular method of estimation as inherently unreliable, preferring instead to place the burden on the ALJ to inquire as to other factors supporting the VE's findings." *Dawn L. C.*, 2021 WL 4488421, at *6 (citing *Chavez*, 895 F.3d at 970; *Biestek*, 139 S. Ct. at 1157); *see Ruenger,* 23 F.4th at 764 ("We have never enjoined the use of the equal distribution method, but we have required that a vocational expert justify her use of it." (citation omitted)); *Coyier v. Saul*, 860 F. App'x 426, 428 (7th Cir. 2021) (stating that *Chavez* "did not enjoin the use of the equal-distribution method").

"[W]hen a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology." *Ruenger*, 23 F.4th at 764 (citing *Chavez*, 895 F.3d at 970). As the Seventh Circuit has opined: "Although the ALJ asked [the VE] to describe her methodology, substantial evidence requires more. The ALJ must hold the vocational expert to account for the reliability of her job-number estimates." *Id.* (citation, brackets, and internal quotation marks omitted); *see, e.g., Albright*, 2022 WL 669897, at *7.

2. The VE's Hearing Testimony and Frasier's Objections

At the administrative hearing, the VE testified that a hypothetical individual with Frasier's age, education, work experience, and RFC could perform the representative unskilled, light-

---

[6] Specifically, in *Alaura*, the Seventh Circuit stated:

> The problem appears to be that the only reliable statistics are census data for broad categories of jobs, rather than for jobs in the narrower categories that the applicant for benefits is capable of doing. Typically, it appears, the vocational expert simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow *categories* in the broad category, thus assuming that each narrow category has the same number of jobs as each other narrow category—which is preposterous. A vocational expert's stated number of jobs in a narrow category seems likely, therefore, to be a fabrication.

797 F.3d at 507-08 (internal citation omitted).

exertional occupations of Routing Clerk, 30,000 jobs nationally; Mail Clerk, 11,000 jobs nationally, and General Office Helper, 10,500 jobs nationally. (AR 67). The ALJ, in reliance on the VE's testimony, concluded that Frasier was not disabled because she could still perform a significant number of jobs in the national economy despite the credible limitations caused by her impairments. (AR 33-34).

At the hearing, Frasier's attorney questioned the VE about the methodology she used in arriving at the job numbers:

> Q [C]ould you tell us the methodology you use to get to the national job number totals?
>
> A Yes, I look at information from the U.S. Department of Labor, the Bureau of Labor Statistics. I also utilize the Job Browser Pro program, the SkillTRAN program. That combined with some articles that have been published researching the sit-stand option.
>
> Q Okay. . . . [O]n Job Browser Pro, is this methodology, essentially it starts with a standard occupational classification code. Certain occupations that might be obsolete are eliminated then the total job number in the standard occupational classification code is modified after looking at the next code. Am I kind of getting it right so far?
>
> A Yes, we have that larger [Occupational Employment Survey (OES)] group estimate a number. They look at the number of [Dictionary of Occupational Titles (DOT)] codes in that OES group. They look at the industry, they estimate what percent, they estimate which industries that DOT is likely to be employed in and then . . . . get to the percentages coming in from that number. If there's more than one DOT code that's likely to be employed in a certain industry and that is where the occupational density factor comes in and that's a percentage of numbers being reported. So that is where equal distribution would happen.
>
> Q So, equal distribution occurs after the occupational density factor is determined?
>
> A Correct.
>
> Q So, . . . just imagine if 500,000 jobs after the occupational density factor had been used and there's 20 occupational titles then the 500,000 is divided by the 20. Is that roughly then what you mean by equal distribution?

> A Well, . . . the equal distribution is the very last factor. So, there's a whole group . . . . that is filtered down by industry and then the industries are picked up for the DOT code and then at that point is where the equal distribution happens.

(AR 71-73).[7]

At this point, Frasier's attorney raised two objections to the ALJ:

> So, Your Honor, I have two objections. One is the numbers cannot be designated as significant because . . . there have been no standards set forth that the [VE] can make any kind of testimony about that.
>
> Second, using equal distribution method to determine national numbers per occupational title, even if there's been some tweaking of occupational grouping or an industry grouping, still contains all of the logical problems pointed out by Judge Posner in Browning, Alaura, Chavez, Herman, Brace and it probably would not, as described, . . . yield reliable numbers.

(AR 73). In response, the ALJ did not question the VE but instead ended the hearing abruptly, cursorily stating: "[Y]our objections will be addressed in the decision. Suffice it to say in summary because we've run out of time, that they are overruled." (*Id.*).

3. The ALJ Addresses Frasier's Objections in Her Decision

In her decision, the ALJ penned several paragraphs about Frasier's objections to the VE's testimony:

> The claimant's representative objected to [the] job numbers on the ground the [VE's] methodology for determining numbers of jobs is not reliable. He further objected to the job numbers being in significant numbers in the national economy. The undersigned overrules [the claimant's representative's] objections. The [VE] has professional knowledge and experience in job placement. Nothing

---

[7] SkillTRAN is a software producer, which produces a variety of programs for vocational professionals, such as Job Browser Pro and Occubrowse. *See Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169, at *12 (E.D. Wis. Sept. 24, 2021). OES is produced by the Department of Labor and provides statistics by its own categorization system referred to as the "standard occupational classification" (SOC) system. *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020). And the DOT is a "Social Security Administration resource that lists occupations existing in the economy and explains some of the physical and mental requirements of those occupations." *Ferguson v. Berryhill*, 381 F. Supp. 3d 702, 705 n.2 (W.D. Va. 2019) (all brackets omitted) (citing *Pearson v. Colvin*, 810 F.3d 204, 205 n.1 (4th Cir. 2015)); *see also Tolbert v. Astrue*, No. 2:07-CV-426-PRC, 2008 WL 4449557, at *2 n.1 (N.D. Ind. Sept. 26, 2008).

> in the Social Security Administration rules or regulations requires a vocational expert to be a statistician. 20 CFR 404.1566 requires only a job exists in the national economy, meaning it has a significant number of jobs.
>
> The undersigned notes the number of jobs cited by the [VE] is an *estimate* the impartial [VE] has based on reliable information from various sources, some of which the undersigned takes administrative notice (*See* 20 CFR 404.1566(d)). An exact number of jobs is not needed to be provided, rather, the burden at step five . . . is to show a significant number of jobs exist within the confines of the hypothetical. The impartial [VE] is a qualified expert for purposes of the testimony at the hearing and is qualified to provide an estimate of jobs. The undersigned accepts the testimony of the impartial [VE] and finds there are a sufficient number of jobs that exist in the above cited positions. The undersigned notes even if the numbers provided by the impartial [VE] were over inclusive, far fewer numbers of available jobs would suffice. The [VE's] testimony did not identify an isolated job that exists only in very limited numbers in relatively few locations (SSR 00-4p). Accordingly, the [VE's] job information is found to be reliable.
>
> Pursuant to SSR 00-4p, the [VE's] testimony is consistent with the information contained in the [DOT], except work with an option to change positions no more frequently than every 30 minutes, while remaining on task, and the type and frequency of interaction with others is not addressed by the [DOT]. The [VE] testified her answers on these issues were based on her education, training, and professional experience. The undersigned accepts this testimony as reliable.

(AR 33-34).

   4. <u>Analysis</u>

Plaintiff's objection to the VE's use of the "equal distribution" method in estimating the number of jobs reflects an evolving area of Social Security law in the Seventh Circuit. *See, e.g.*, *Eidenier v. Kijakazi*, 1:20-CV-277-JPK, 2022 WL 179060, at *5 (N.D. Ind. Jan. 19, 2022). As the Court has explained in another case:

> ALJs and VEs typically refer to specific jobs by the names and numbers identified in the [DOT], published by the Department of Labor. . . . The DOT describes job duties and requirements but does not indicate the prevalence of those jobs within the national economy. A separate publication, the Department of Labor's compilation of [OES], provides estimates about the prevalence of certain jobs, but classifies jobs more broadly than the DOT code. The upshot is that VEs often must estimate how many specific positions are available based on estimates of

11

broader categories.

*Id.* (citation and footnote omitted); *see also Chavez*, 895 F.3d at 965-66 ("When a VE identifies an SOC code and the number of jobs in that code, that number approximates (at best) the number of positions within a DOT job group—not the specific DOT job title that the VE identified as suitable for a particular claimant. Vocational counselors have recognized that this crude data matching is highly inaccurate and thus are advised not to perform this analysis in other areas of their practice (when they are not testifying in a disability hearing.)" (citation omitted)).

"Two methods of estimation have attracted particular attention within Seventh Circuit case law." *Eidenier*, 2022 WL 179060, at *5. "One is the 'equal distribution' method, which assumes that if there are a certain number of jobs within a particular SOC category, those jobs are spread equally among the various DOT jobs that make up that category." *Id.* "The Seventh Circuit has criticized this approach . . . . [but] has not conclusively rejected the approach as unreliable." *Id.* at *5-6 (citing *Coyier*, 860 F. App'x at 428).

The second method is use of Job Browser Pro, also known as SkillTRAN, which is a statistical database that "estimates employment numbers and cross-references to all major national occupational coding systems." *Id.* (brackets, internal quotation marks, and footnote omitted). "In contrast to the . . . equal distribution method, SkillTRAN's occupational density method relies on the Department of Labor's [OES] . . . to estimate the number of available jobs." *Dawn L.C.*, 2021 WL 4488421, at *6 (citing *Bruno*, 817 F. App'x at 243). "Although SkillTRAN appears to be a commonly used database, the ALJ must still elicit 'substantial evidence' showing that the way the VE used the program was reliable." *Eidenier*, 2022 WL 179060, at *6 (citation omitted). That is, "the mere fact that SkillTRAN was used is not itself substantial evidence of reliability." *Id.* at *8 (collecting cases). "[T]he issue . . . is not whether SkillTRAN is reliable as

a matter of law, but rather whether the VE's testimony . . . , drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden." *Dunn*, 2021 WL 5105169, at *1 (collecting cases).

Frasier contends that the VE's testimony is unreliable because the VE used, at least in part, the equal distribution method and did not explain why such method was reliable. (ECF 17 at 19). But to clarify, the Seventh Circuit "did not enjoin the use of the equal-distribution method . . . ." *Coyier*, 860 F. App'x at 428 (citation omitted). "[T]he substantial-evidence standard still governs." *Id.* (citation omitted). Here, the VE explained that he obtained information from the Bureau of Labor Statistics and used the SkillTRAN program, and combined these with several published articles for the sit-to-stand option. (AR 71-72). Frasier's counsel then inquired into the VE's knowledge of the methodology used by SkillTRAN. (AR 72). In response, the VE stated that SkillTRAN uses OES data and then estimates the number of DOT codes in that OES group and "which industries that DOT is likely to be employed in." (*Id.*). The VE explained that "[i]f there [is] more than one DOT code that [is] likely to be employed in a certain industry," then an "occupational density factor" is applied. (*Id.*); *see Dawn L.C.*, 2021 WL 4488421, at *6. The VE then stated that the "equal distribution" method is applied as "the very last factor," that is, after the occupational density factor is determined. (AR 72; *see also* AR 73).

Frasier argues that the ALJ erred by failing to inquire further into the VE's methodology once her attorney raised an objection to the VE's use of the equal distribution method. Indeed, after Frasier's attorney objected, the ALJ made no further inquiry and instead abruptly ended the hearing, stating summarily that Frasier's objections were overruled and would be addressed in her decision. While the Court is "mindful of the time constraints and heavy caseloads faced by ALJs[,] . . . when a claimant challenges a vocational expert's job-number estimates, the ALJ has

13

a duty to spend time inquiring into the expert's methodology." *Ruenger*, 23 F.4th at 764 (citation omitted); *see also Rosner v. Kijakazi*, No. 20-C-1346, 2022 WL 110309, at *4 (E.D. Wis. Jan. 12, 2022); *Albright*, 2022 WL 669897, at *8 ("At the very least, the record would benefit from everyone slowing down when VEs take the stand. A disability determination may well mark the difference between income and no income for the claimant." (citation omitted)).

The ALJ did acknowledge the VE's objections in her decision. (AR 33). But in doing so, the ALJ never actually confronted Frasier's objection about the VE's reliance on the equal distribution method. Instead, the ALJ offered various boilerplate statements, such as that the VE was not required to be a "statistician," that the VE need only provide an "estimate" of jobs, and that even if the VE's estimate was "over inclusive, far few numbers of available jobs would suffice." (*Id.*). But "[a]n unreliable job-number estimate cannot be considered reliable merely because it is large." *Brace*, 970 F.3d at 823 (citation omitted)); *see also Bradley F. v. Comm'r of Soc. Sec.*, No. 21-cv-524-SMY, 2022 WL 4467645, at *4 (S.D. Ill. Sept. 26, 2022).

The ALJ also cites the VE's "professional knowledge and experience in job placement" in overruling Frasier's objection. (AR 33). But the VE never testified that she relied on her experience and qualifications when estimating job numbers; rather, she did so when testifying about whether certain limitations or allowances were contained in the DOT. (AR 34, 68); *see Gallegos v. Saul*, No. 19-CV-1642-SCD, 2020 WL 5820597, at *6 (E.D. Wis. Sept. 30, 2020) ("The ALJ further overruled [the claimant's] objection to the VE's job-number testimony because 'the numbers provided were based upon his education, training, and experience.' In fact, the VE said no such thing. What the VE did say was that his testimony about limitations or allowances included in the hypothetical that were not addressed in the DOT was based on his experience." (internal citations omitted)). "[A] VE's experience and qualifications alone cannot

14

establish substantial evidence when [she] does not explain how that experience informs [her] methodology." *Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023); *see Rennaker v. Saul*, 820 F. App'x 474, 479 (7th Cir. 2020) ("Although the VE pointed to his own education, research, training, and experience in job placement and vocational rehabilitation to explain the *kind* of work Rennaker could perform, the VE did not explicitly tie this background to his estimate of nationwide job numbers."); *Agnieszka P. v. O'Malley*, No. 21 CV 1433, 2024 WL 325297, at *7 (N.D. Ill. Jan. 29, 2024) ("[T]he VE testified that she relied on her professional experience to conclude there would be no competitive work available to someone with the hypothetical limitations posed by the ALJ who was off task more than 15% of the day or absent more than two days per month. The VE did not, however, testify that she applied her own experience in considering the SkillTRAN estimates . . . ." (internal citations omitted)).

The ALJ additionally stated in overruling the objection that the VE's testimony was "based on reliable information from various sources, some of which the [ALJ] takes administrative notice." (AR 33 (citing 20 C.F.R. § 404.1566(d)). "The problem here, however, is not the VE's qualifications or sources—it's [her] methodology." *Gallegos*, 2020 WL 5820597, at *6. In any event, SkillTRAN is not included in the list of publications from which an ALJ may take administrative notice of reliable job information. *See* 20 C.F.R. § 404.1566(d). Furthermore, "while SkillTRAN may be an acceptable source, it might not be a reliable methodology for a VE to rely solely on SkillTRAN estimates without some further analysis based on the expert's experience, expertise, or comparison with other sources." *Agnieszka P.*, 2024 WL 325297, at *6. To reiterate, "the mere fact that SkillTRAN was used is not itself substantial evidence of reliability." *Id.* (collecting cases).

In sum, while Frasier's concerns about the VE's partial reliance on the equal distribution

method likely "could have been avoided by further testimony from the [VE], . . . the ALJ did not press [the VE] to elaborate upon her methodology." *Ruenger*, 23 F.4th at 764. That is, there is no evidence that the ALJ relied on her own experience or research in addition to SkillTRAN to arrive at the job number estimates, or that the VE had used SkillTRAN for many years, or that SkillTRAN was widely accepted by other vocational experts. *Cf. Agnieszka P.*, 2024 WL 325297, at *7 ("[T]he Court agrees with the many decisions in which courts consider additional indicia of reliability, such as the VE's reconciling or adjusting SkillTRAN estimates based on the expert's own professional experience, before concluding an expert's methodology is supported by substantial evidence." (collecting cases)); *Wilcox v. Comm'r of Soc. Sec.*, No. 1:22-cv-00187-SLC, 2023 WL 6364358, at *6-7 (N.D. Ind. Sept. 29, 2023); *Case v. Comm'r of Soc. Sec.*, No. 1:21-cv-0051-SLC, 2022 WL 2063332, at *7 (N.D. Ind. June 8, 2022).

Consequently, on this record, the ALJ's step-five finding will be remanded so that the basis for the VE's job estimates can be explored more thoroughly and the ALJ can consider additional evidence on this issue if necessary. *See Agnieszka P.*, 2024 WL 325297, at *8.

### D. Frasier's Remaining Arguments

Because this case will be remanded based on the ALJ's step-five finding, the Court need not reach Frasier's remaining arguments. Nevertheless, having reviewed those arguments, the Court encourages the Commissioner on remand to address two points that Frasier raises therein.

1. <u>Use of a Cane</u>

When arguing that the ALJ failed to build a logical bridge from the evidence to the RFC, Frasier asserts that the ALJ ignored or overlooked that she "was prescribed a cane in April of 2021" and that her function report indicates she uses it "daily." (ECF 17 at 14). Indeed, the ALJ never mentioned this evidence, stating summarily that "the record . . . did not indicate the

claimant used an assistive device for ambulation." (AR 25).

It is true that Frasier does not point to any medical appointment of record where she appeared with a cane; nor did she produce an actual prescription for a cane. And when testifying about her ambulation and functional abilities at the hearing, she did not mention use of a cane. (*See* AR 57-64). Yet, there is at least some evidence of record pertaining to a cane that the ALJ failed to mention. Both Frasier and her husband represent in their function reports that Frasier began using a cane after she had her third baby in April 2021 and that it was "prescribed by a doctor." (AR 216, 233, 241). At least one of the reviewing state agency physicians noted these function reports when completing the disability determination explanation, summarizing Frasier's and her husband's statements that she "[u]ses a cane prescribed 04/2021." (AR 85).

Additionally, after Frasier had her third baby in April 2021, the hospital discharge summary instructed her to use a cane "given" to her by a physical therapist. (AR 374). Further, Michael Rosen, D.O., wrote in April 2022 that Frasier's pain worsened after delivery of her third baby in April 2021; that her March 2022 X-rays demonstrated "severe, chronic deformity of femoral head consistent with Perthes disease"; and that he discussed conservative treatment options with Frasier, including, "assistive devices (shopping cart/cane/crutches/walker)." (AR 581, 583-84). Dr. Rosen then referred Frasier to a total joint specialist, opining that "surgical treatment most likely to give the greatest pain relief and longevity would be a [total hip arthroplasty]." (AR 584).

Given that this case is already being remanded on other grounds, the ALJ is encouraged on remand to fully address the evidence of record pertaining to Frasier's use of a cane and any provider recommendation that she use a cane.

17

### 2. 2020 CT Scan and 2022 X-ray Evidence

In her second argument (ECF 17 at 16), Frasier faults the ALJ for relying on the reviewing state agency physicians' opinions penned in October and November 2021 (AR 75-81, 83-90), where there is no evidence these doctors saw her March 2020 CT scan showing a "[l]eft hip deformity . . . with *severe* secondary osteoarthritis" (AR 327 (emphasis added)). She also argues that the state agency physicians were not privy to her March 2022 X-rays (AR 589) or Dr. Rosen's interpretation of them (AR 583, 587 (emphasis added)) as demonstrating a "[c]hronic deformity in the left femoral head . . . likely related to . . . Legg-Calve Perthes" and "*severe*, chronic deformity of femoral head consistent with Perthes disease," respectively. (ECF 17 at 15-16). It appears the state agency physicians instead reviewed Frasier's April 2021 X-rays, which revealed "*[m]inimal* right and *mild* left hip osteoarthritis." (AR 381 (emphasis added); *see* AR 84). Frasier argues that the reviewing state agency physicians' opinions that she could stand or walk six hours in an eight-hour day without an assistive device may have been different if these doctors had reviewed the March 2020 CT scan and the March 2022 X-rays, which documented more severe findings than the April 2021 X-rays. (ECF 25 at 7-8; *see* AR 78, 87).

Given that this case is already being remanded on other grounds, the ALJ is encouraged on remand to seek an updated state agency physician review of the record, including review of the March 2020 CT scan (AR 327), the March 2022 X-rays (AR 589), and Dr. Rosen's interpretation of the March 2022 X-rays (AR 583, 587).

### IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and

Order. The Clerk is DIRECTED to enter a judgment in favor of Frasier and against the Commissioner.

SO ORDERED.

Entered this 27th day of March 2024.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge